IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JIYAN AN,

    Plaintiff,

vs.                                            Civ. No. 00-147 JP/WWD (ACE)

REGENTS OF THE UNIVERSITY
OF CALIFORNIA d/b/a LOS ALAMOS
NATIONAL LABORATORY, UNITED
STATES DEPARTMENT OF ENERGY,
ROBERT CARY, MORTON BRADBURY,
and JOHN E. "JACK" FOLEY,

    Defendants.

MEMORANDUM OPINION AND ORDER

On February 1, 2001, Defendants Regents of the University of California d/b/a Los Alamos National Laboratory (UC Board of Regents), Morton Bradbury, and John E. "Jack" Foley (collectively the Lab Defendants) filed the University's, Morton Bradbury's and John Foley's Motion for Summary Judgment (Doc. No. 157). Having reviewed the parties' briefs and the relevant law, I find that the motion for summary judgment should be granted.[1]

---

[1] Defendant Cary has settled with the Plaintiff. Stipulated Notice of Dismissal (Doc. No. 258), filed June 7, 2001. The claims against the Defendant Department of Energy have been dismissed with prejudice. Summary Judgment as to Defendant United States Department of Energy (Doc. No. 242), filed May 24, 2001. The New Mexico Human Rights Act and intentional infliction of emotional distress claims against the UC Board of Regents have also been dismissed. Dismissal of Certain Claims (Doc. No. 244), filed May 24, 2001. The negligent supervision and aiding and abetting claims against Defendants Foley and Bradbury in their official capacities have been dismissed as well. *Id*. The remaining claims in this case are the Title VII claim against the UC Board of Regents, and the negligent supervision and aiding and abetting claims against Defendants Foley and Bradbury in their individual capacities. This Memorandum Opinion and Order disposes of these remaining claims.

A.  Background

This is a sexual harassment case brought by a female employee[2] at LANL against several defendants.  The Plaintiff began work as a graduate research assistant working for Defendant Cary on March 17, 1997.  The Plaintiff alleges that Defendant Cary began sexually harassing her in May 1997 and that in June 1997 the harassment escalated to a sexual relationship.  On November 11 or 12, 1997 during a work day, Plaintiff's husband went to the apartment he shared with the Plaintiff.  The door was locked and he found the Plaintiff and Defendant Cary inside the apartment. Apparently, late that night the Plaintiff's husband called the Plaintiff's group leader, David Chen, about the apartment incident.  Mr. Chen was preparing to leave on an extended vacation within a few hours.  Mr. Chen advised the Plaintiff's husband to have the Plaintiff speak with him if she believed she was being harassed and that she could e-mail him about this matter since he would be away, but would be able to access e-mail messages.  Plaintiff did not contact Mr. Chen.

On November 21, 1997, the Plaintiff and her husband met with Defendant Foley at the Human Resources Department to discuss the apartment incident.  The Plaintiff states that she and her husband complained to Defendant Foley that: 1) Defendant Cary conversed with the Plaintiff at work about personal matters like his wife's body and told sexually explicit jokes; 2) Defendant Cary closed the door at work when he was with female employees; and 3) Defendant Cary should

---

[2]The Plaintiff first worked at Los Alamos National Laboratory (LANL) as a volunteer in December 1996.  LANL initially hired the Plaintiff as a full-time staff research assistant in the LANL Graduate Research Assistant Program on March 17, 1997 for a one year term with an option for renewal of the contract at the discretion of LANL.  On May 12, 1997, the Plaintiff was reclassified as an Under Graduate Student Post-Baccalaureate (UGS) Tech with a one year term.

not have locked the door at the Plaintiff's apartment.  The Plaintiff did not tell Defendant Foley that she and Defendant Cary had been having a sexual relationship for several months.  The Plaintiff also did not later attempt, outside the presence of her husband, to speak with Defendant Foley by phone or in person about the sexual relationship she had with Defendant Cary.  After meeting with Plaintiff and her husband and then conducting a management inquiry which included interviewing people, Defendant Foley forwarded this matter to the line management.

On November 26, 1997, Defendant Bradbury (Plaintiff's division leader), Scott Cram (assistant division leader), Plaintiff, and Plaintiff's husband met to discuss the apartment incident.  Defendant Cary later joined the meeting.  The Plaintiff's husband expressed concern about the improper appearance of his wife and Defendant Cary being at the apartment with the door locked.  The Plaintiff did not indicate during that meeting that she felt uncomfortable with the personal conversations Defendant Cary had with her.  The Plaintiff's husband did not ask for an investigation although he suggested changing the Plaintiff's supervisor or work group.  Mr. Cram indicated that a transfer to a different work situation would depend on funding availability.  The parties at the meeting then agreed that the Plaintiff would continue to work where she had been working and that when Mr. Chen returned form his vacation he would decide on Plaintiff's  work situation.  The parties at the meeting also agreed that the Plaintiff would not work overtime and that Defendant Cary could not talk to the Plaintiff without another person being present.  Mr. Cram subsequently asked the Plaintiff on two or three occasions how work was going and she responded "fine."  Sometime during December 1997, Defendant Cary and the Plaintiff resumed their sexual relationship. The Plaintiff did not, however, make any effort to speak to either Defendant Bradbury or Mr. Cram about the resumption of the sexual relationship.

About a week after the meeting with Defendant Bradbury and Mr. Cram, Mr. Chen came back from his vacation.  The Plaintiff met with Mr. Chen alone and asked him to change her supervisor.  Mr. Chen formally changed the Plaintiff's supervisor to himself although the Plaintiff continued to work under Defendant Cary's direct supervision. The Plaintiff agreed to this nominal change in supervisor to placate her husband.  The Plaintiff also told Mr. Chen that she got along "okay" with Defendant Cary.  Mr. Chen asked Plaintiff, specifically, if "she was being sexually harassed at the work place, and she said no."  "In Confidence" Statement by David Chen, LS-6 at 2 (attached to Exhibit G of Plaintiff's Exhibits). This apparently occurred before Defendant Cary and the Plaintiff resumed their sexual relationship in December 1997.  The Plaintiff did not tell Mr. Chen about the resumption of the sexual relationship with Mr. Cary when it occurred.  A co-worker, Paige Pardington, told Mr. Chen at some unspecified time that she thought "something was going on between" the Plaintiff and Defendant Cary because she observed that the Plaintiff and Defendant Cary went to lunch together although they were both married.

On March 26, 1998, the Plaintiff went to the Human Resources Department and formally complained of sexual harassment.  The Plaintiff disclosed for the first time that she had been involved in a long term sexual relationship with Defendant Cary.  Shortly thereafter, the Plaintiff was transferred to another division.  The Plaintiff's employment contract was subsequently extended but was not renewed the following year in May 1999. LANL declined to extend the Plaintiff's appointment because she failed to meet program eligibility requirements by gaining acceptance into a college graduate program and her background did not meet the programmatic needs of the new division.

4

After the Plaintiff made her March 26, 1998 complaint of sexual harassment, Employee Relations investigated the allegations of an inappropriate sexual relationship between the Plaintiff and Defendant Cary. On June 11, 1998, Mr. Chen suspended Defendant Cary from work without pay for 25 days, required Defendant Cary to attend sexual harassment prevention training within 30 days of his return to work, and forbade Defendant Cary from supervising female students for two years. Mr. Chen also noted that any recurrence of this type of behavior could result in Defendant Cary's termination.

The remaining claim against the UC Board of Regents is the sexual harassment and retaliation claim in violation of Title VII of the Civil Rights Act of 1964, as amended. The remaining claims against Defendants Bradbury and Foley are the negligent supervision and aiding and abetting claims made against them in their individual capacities. These claims are the only claims that remain in this case.[3]

The Lab Defendants argue that the UC Board of Regents is not vicariously liable under Title VII for Defendant Cary's alleged sexual harassment. The Lab Defendants also argue that if summary judgment is granted as to the Title VII claim, this Court should decline to exercise supplemental jurisdiction over the remaining state claims. The Lab Defendants further argue that Defendants Bradbury and Foley are immune from suit under the California Tort Claims Act, and the Plaintiff cannot seek punitive damages from the UC Board of Regents under the California Tort Claims Act. Finally, the Lab Defendants argue that there is no evidence to support the aiding and abetting claims against Defendants Bradbury and Foley.

---

[3] See footnote 1.

The Plaintiff asserts that the UC Board of Regents is vicariously liable for Defendant Cary's conduct and was negligent in allowing Defendant Cary to sexually harass the Plaintiff. The Plaintiff further asserts that Defendants Bradbury and Foley are not immune from suit under the California Tort Claims Act, but Plaintiff concedes that the UC Board of Regents might not be liable for punitive damages. The Plaintiff also asserts that there is sufficient evidence to support the aiding and abetting claims.

B.  Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996) (citation omitted). The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of his or her pleadings. *Bacchus Indus., Inc.*, 939 F.2d at 891.

C. Discussion

    1. Vicarious Liability Under Title VII

The UC Board of Regents contends that under the *Faragher/Burlington* affirmative defense it has no vicarious Title VII liability for Defendant Cary's conduct.[4] In order for an employer to raise the *Faragher/Burlington* defense, a tangible employment action must not have resulted from the supervisor's harassing conduct. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id*. at 761. A tangible employment action usually "inflicts direct economic harm" and "in most cases is documented in official company records, and may be subject to review by higher level supervisors." *Id*. at 762. Once the employer shows that no tangible employment action was taken by the harassing supervisor against the plaintiff, the employer must establish by a preponderance of the evidence that 1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and 2) "the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id*. at 765.

    a. Tangible Employment Action.

The Plaintiff asserts that four tangible employment actions resulted from the alleged sexual harassment by Defendant Cary: job insecurity, deactivation of Plaintiff's badge reader, failure to promote or rehire, and reassignment to an undesirable position. The cases the Plaintiff cites to

---

[4]For purposes of deciding this motion to summary judgment, I will assume that Defendant Cary was the Plaintiff's supervisor and sexually harassed the Plaintiff, propositions which the Plaintiff advocates.

7

support her assertion that job insecurity is a tangible employment action discuss whether a plaintiff has established *quid pro quo* sexual harassment or retaliation by proving that an adverse employment action occurred. *See Jeffries v. State of Kansas*, 147 F.3d 1220, 1232 (10th Cir. 1998); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296 (3rd Cir. 1997); *Carney v. City of Shawnee*, 38 F.Supp.2d 905, 907-08 (D. Kan. 1999). Plaintiff has alleged and pursued this case, however, as a hostile work environment claim, not as a *quid pro quo* action. In addition, the Plaintiff fails to explain why an adverse employment action should be considered the equivalent of a tangible employment action. Job insecurity does not constitute a significant change in employment status nor does it inflict a direct economic harm. Finally, it is highly unlikely that there would be any official documentation of job insecurity. For these reasons, I find that creation of a feeling of job insecurity is not a tangible employment action.

The Plaintiff also argues that the deactivation of her badge reader is a tangible employment action. Apparently, the Plaintiff was not able to use her badge reader on one occasion. There is no evidence that the Plaintiff could not otherwise gain entry to her work area. This incident can hardly be described as a "significant" change in employment status or causing a direct economic harm. I, therefore, find that this one-time deactivation of the Plaintiff's badge reader was not a tangible employment action.

The Plaintiff further argues that LANL's failure to promote her is a tangible employment action. According to the Plaintiff, Defendant Cary promised to promote her to a permanent technician position but did not do so. However, there is no evidence that the Plaintiff ever applied for a promotion or that Defendant Cary prevented her from applying or that Defendant Cary denied her a promotion. Accordingly, LANL's failure to promote the Plaintiff cannot possibly

8

constitute a tangible employment action.

The Plaintiff argues next that LANL's reassignment and failure to rehire her constitute tangible employment actions. A tangible employment action occurs as a result of the culmination of the supervisor's harassment. *Kohler v. Inter-Tel Technologies*, 244 F.3d 1167, 1179-80 (9th Cir. 2001); *Fierro v. Saks Fifth Ave.*, 13 F.Supp.2d 481, 491 (S.D. N.Y. 1998). Moreover, a reassignment is a tangible employment action if it carries "significantly different responsibilities, or ... a significant change in benefits." *Ellerth*, 564 U.S. at 761.

The Plaintiff's initial UGS appointment was as a graduate research assistant under the supervision of Defendant Cary. The UGS appointment was for a one year term and required the Plaintiff to perform certain activities such as attending graduate level courses. Defendant Cary's ability to have a graduate research assistant depended on funding from Defendant Cary's grant. The Plaintiff requested a reassignment to distance herself from Defendant Cary. Defendant Bradbury approved a lateral transfer of the Plaintiff to the Chemical Sciences and Technology Division (CST) "without any change in benefits, working conditions, salary or opportunities." Ex. G at ¶3 (attached to Exhibits in Support of Memorandum in Support of the University's, Morton Bradbury's and John Foley's Motion for Summary Judgment (Doc. No. 165) (Lab Defendants' Exhibits), filed Feb. 1, 2001). The Plaintiff did not suffer any direct economic harm by the lateral transfer. The Plaintiff's UGS appointment with the CST was subsequently extended until May 14, 1999 so that the Plaintiff could complete a chemistry course. Ex. 1 of Ex. E (attached to Response to Lab Defendants' Motion for Summary Judgment and Memorandum in Support (Doc. No. 207) (Plaintiff's Exhibits), filed April 9, 2001). Plaintiff's UGS appointment was not thereafter renewed because the Plaintiff's "background [did] not meet the programmatic

9

needs of CST...." *Id*. In addition, the Plaintiff had not gained acceptance into a college graduate program as the UGS appointment required. The fact that the CST did not renew the Plaintiff's UGS appointment has not been attributed to Defendant Cary.

In sum, the Plaintiff has not shown that there is a genuine issue of material fact regarding the taking of a tangible employment action against the Plaintiff based on Defendant Cary's alleged sexual harassment of the Plaintiff. The UC Board of Regents is, therefore, entitled to present the *Faragher/Burlington* affirmative defense to vicarious liability.

>    b. Employer's exercise of reasonable care to prevent and correct promptly any sexually harassing behavior.

LANL has a written policy on sexual harassment which provides a mechanism for making complaints of sexual harassment. *See Hollins v. Delta Airlines*, 238 F.3d 1255, 1258 (10th Cir. 2001) (written harassment policy is relevant to issue of vicarious liability). The Plaintiff received General Employee Training (GET) in December 1996 when she volunteered to work at LANL. At that time, the Plaintiff was given a GET manual which stated LANL's sexual harassment policy and provided a means of obtaining more information. Ex. I (attached to Lab Defendants' Exhibits). The LANL director also e-mailed to all employees a reminder memorandum about the sexual harassment policy in April 1997 shortly after Plaintiff began working as an employee. Ex. B at 58-60 (attached to Lab Defendants' Exhibits). The sexual harassment policy was also available to employees on-line. Ex. B at 44 (attached to Plaintiff's Exhibits). The Plaintiff has not come forward with evidence showing that there is a genuine issue of material fact as to the UC Board of Regents' exercise of reasonable care to prevent sexual harassment. *See Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2nd Cir. 2001); *Brown v. Perry*, 184 F.3d 388, 396 (4th Cir.

1999).

The uncontroverted evidence also shows that once Plaintiff's husband told Mr. Chen about the apartment incident, Mr. Chen asked that the Plaintiff either talk to him or send him an e-mail about any sexual harassment. The Plaintiff did not contact Mr. Chen by e-mail or otherwise at that time. Having only the information that the Plaintiff was with Defendant Cary inside the apartment with the door locked is insufficient evidence to alert Mr. Chen that Defendant Cary was sexually harassing the Plaintiff. In fact, there is no evidence that any sexual harassment occurred at the apartment that day. Moreover, the evidence does not indicate when Ms. Pardington commented to Mr. Chen about the Plaintiff and Defendant Cary going to lunch together. She did not describe this as sexual harassment and her casual comment does not support an inference of sexual harassment.

After the Plaintiff and her husband met with Defendant Foley, Defendant Foley immediately conducted a management inquiry. The only substantive allegation of sexual harassment that Plaintiff and her husband made to Defendant Foley involved Defendant Cary's conversations regarding personal matters and sexually explicit jokes. Even so, there is no evidence as to the frequency or degree of lewdness of the sexually explicit jokes. Defendant Foley reported the matter to line management. Less than a week later, the Plaintiff and her husband met with Defendant Bradbury and Mr. Cram, members of the line management team. They all came to a mutually acceptable agreement to resolve the Plaintiff's complaint by restricting her work to regular hours with no overtime and by not allowing the Plaintiff to be alone when speaking with Defendant Cary. The subsequent feedback Mr. Cram received from the Plaintiff about this work arrangement was positive. Not hearing any more complaints from the

Plaintiff or her husband, Defendant Bradbury and Mr. Cram reasonably could be expected to believe that the matter had ended at that time. *See Brown*, 184 F.3d at 396 ("The law requires an employer to be reasonable, not clairvoyant or omnipotent.").

Soon thereafter, when Mr. Chen came back from his vacation, the Plaintiff did not tell Mr. Chen that she had been or was being sexually harassed. Her agreement to nominally change supervisors to placate her husband was not indicative of sexual harassment: it suggested an effort to assuage a jealous husband. Mr. Chen was not put on notice that there was a sexual harassment problem at that time.

The Plaintiff's formal complaint to Human Resources in March 1998 of sexual harassment resulted in the Lab Defendants suspending Defendant Cary without pay, requiring Defendant Cary to attend a sexual harassment course, and prohibiting Defendant Cary from supervising female students for two years. These actions were both punitive and designed to prevent further sexual harassment. *See Baty v. Willamette Industries, Inc.*, 172 F.3d 1232, 1242-43 (10th Cir. 1999) (disciplinary action is relevant to whether the employer adequately responded to the harassment).

Defendant Foley, Defendant Bradbury, Mr. Cram, and Mr. Chen addressed the problems the Plaintiff and her husband presented to them promptly and as best they could based on the limited information Plaintiff and her husband had disclosed to them. They were unaware of and could not have been reasonably expected to have known of the sexual relationship between Defendant Cary and the Plaintiff because Plaintiff withheld this information from them. Once the underlying sexual relationship was divulged in March 1998, Mr. Chen disciplined Defendant Cary and took measures to avoid future sexual harassment by Defendant Cary. Moreover, the Plaintiff, at her request, was transferred to the CST division. The Plaintiff has not carried her burden of

showing that there is a genuine issue of fact as to the UC Board of Regents' exercise of reasonable care to correct promptly Defendant Cary's alleged sexually harassing behavior.

>          c. Employee's unreasonable failure to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm.

The Plaintiff did not report the alleged sexual harassment based on her sexual relationship with Defendant Cary until March 1998, approximately 10 months after the relationship began. The Plaintiff explains that she did not know about the sexual harassment policy until March 1998. This explanation flies in the face of the undisputed facts that the Plaintiff received GET training on sexual harassment, was given a GET manual describing the sexual harassment policy, and received an e-mail reminding employees about the sexual harassment policy. In addition, the Plaintiff and her husband knew that they could speak to Human Resources about sexual harassment because they, in fact, did so with respect to the apartment incident in November 1997. Furthermore, the Plaintiff does not explain why she waited from May 1997 until November 1997 to report the sexual harassment based on Defendant Cary's conversations about personal matters and sexually explicit jokes. The Plaintiff has not presented sufficient evidence to show that there is a genuine issue of material fact as to the unreasonableness of Plaintiff's failure to take advantage of the UC Board of Regents' sexual harassment policy or to otherwise avoid harm. In sum, I conclude as a matter of law that the UC Board of Regents is not vicariously liable for the actions of Defendant Cary.

   2. Employer Negligence.

The Plaintiff argues in the alternative that the UC Board of Regents was negligent by "'failing to remedy or prevent a hostile or offensive work environment of which management-level

13

employees knew, or in the exercise of reasonable care should have known.'" *Hirschfeld v. New Mexico Corrections Dept.*, 916 F.2d 572, 577 (10th Cir. 1990) (quoting *EEOC v. Hacienda Hotel*, 881 F.2d 1505, 1516 (9th Cir. 1989)). The fact that there is a written sexual harassment policy is relevant to the negligence issue. *Hollins*, 238 F.3d at 1258. Moreover, the allegations of the locked apartment door incident and that Defendant Cary spoke with female employees behind closed doors are not descriptions of events that would reasonably put Defendant Foley, Defendant Bradbury, Mr. Cram, or Mr. Chen on notice that Defendant Cary was sexually harassing the Plaintiff. The allegation that Defendant Cary had spoken to Plaintiff about inappropriate subjects was promptly remedied when the Plaintiff and Defendant Cary agreed, during the meeting with line managers, that they would not speak with each other at work without others being present and that Plaintiff would not work overtime. The Plaintiff, therefore, has not carried her burden of showing that there is a genuine issue of material fact as to the reasonableness of the management-level employees' actions to stop Defendant Cary's offensive conversations. In addition, the UC Board of Regents could not be held liable for the sexual relationship "because there is no evidence that it could have reasonably known of it" until March 1998. *Id*. In addition, the Plaintiff did not carry her burden of coming forward with evidence of a genuine issue of material fact as to the reasonableness of the management-level employees' actions to stop the harassment after they finally learned of the sexual relationship in March 1998. Summary judgment is, therefore, appropriate as to the Title VII claim against the UC Board of Regents.

    3.  Exercise of Supplemental Jurisdiction.

The only remaining claims in this case are the state claims of supervisor negligence and aiding and abetting asserted against Defendants Bradbury and Foley in their individual capacities. According to 28 U.S.C. §1367(c)(3), a district court may decline to exercise supplemental jurisdiction once it has dismissed the claims over which it had original jurisdiction. S*ee Lancaster v. Independent Sch. Dist. No. 5*, 149 F.3d 1228, 1236 (10th Cir. 1998). If all federal claims are dismissed before trial, state law claims will generally be dismissed as well. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725-26 (1966); *Thatcher Enters. v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990). Because the Plaintiff's remaining federal claim, the Title VII claim against the UC Board of Regents, is subject to summary judgment, I decline to exercise supplemental jurisdiction over the state law negligent supervision and aiding and abetting claims. Since the Title VII claim against the UC Board of Regents and the negligent supervision and aiding and abetting claims will be dismissed for the reasons already given, there is no need to discuss the other issues brought forth in the briefs relating to this motion for summary judgment.

    IT IS ORDERED that

    1.  The University's, Morton Bradbury's and John Foley's Motion for Summary Judgment (Doc. No. 157) will be granted;

    2.  The Title VII claim, based on vicarious liability and employer negligence, against the UC Board of Regents will be dismissed with prejudice; and

    3.  The negligent supervision and aiding and abetting claims against Defendants Bradbury

and Foley in their individual capacities will be dismissed without prejudice.

                                        _____
                                        CHIEF UNITED STATES DISTRICT JUDGE